MARS, INC., Plaintiff,

v.

CONLUX USA CORP., Defendant.

Civ. A. No. 90–751–RRM.

United States District Court,
D. Delaware.

April 15, 1993.

Charles S. Crompton, Jr., and William J. Marsden, Jr., Potter Anderson & Corroon, Wilmington, DE, and John B. Pegram, Peter H. Priest, Bryan C. Zielinski, Wayne S. Breyer, Jeffrey M. Weinick, Davis Hoxie

Faithfull & Hapgood, New York City, for plaintiff.

Allen Terrell, and Richard Whetzel, Richards, Layton & Finger, Wilmington, DE, and Richard H. Zaitlen, J. Nicholas Gross, Gary D. Mann, and Michael J. Newton, Spensley Horn Jubas & Lubitz, Los Angeles, CA, for defendant.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This patent infringement case was tried to a jury after the Court had ordered separate trials on the issues of liability and damages. On May 8, 1992, at the conclusion of the first phase of the trial, the jury returned with a verdict, finding the defendant Conlux USA Corporation ("Conlux") had infringed the plaintiff Mars Incorporated's ("Mars") patent and that the patent was not invalid or unenforceable. Thereafter, the Court entered a judgment in favor of Mars and against Conlux, and enjoined Conlux from making, using, or selling the infringing device.

The parties tried the damages issues to the same jury in December of 1992. On December 18, 1992, the jury returned with a verdict of damages of $545,562, and a finding that Conlux had not willfully infringed Mars' patent. Thereafter, the Court entered a judgment in favor of Mars and against Conlux in that amount.

Following the liability phase of the trial, Conlux moved for judgment as a matter of law, or alternatively, for a new trial. Following the damages phase of the trial, Mars moved for judgment as a matter of law and for a partial new trial. Mars also moved to amend the verdict. Conlux then moved to stay entry of the judgment, or alternatively, to stay execution of the judgment. This is the Court's decision on those motions.

## I. LIABILITY PHASE

### A. The Technology and the Patented Invention

The technology in this case relates to electronic coin changers in vending machines, such as the coin changer in a soda machine. As a consumer places coins in the machine, the changer determines the authenticity and denomination of the coin for the purpose of confirming the sale and providing any change due to the consumer.

The coin changers in vending machines in the 1950's and 60's were mechanical devices that relied on a number of moving parts. They were complicated, difficult to clean, and would jam under a number of different conditions, including at extreme temperatures or when soda or other items were poured into them.

In the 1960's, the vending machine industry began investigating the opportunities to make a transition to electronic coin changers. Mars turned to Arthur D. Little Company for assistance. Engineers at Arthur D. Little began work on an electronic coin changer that would be simple, easy to clean, and inexpensive. One product of that work is the invention described in United States Patent 3,870,137 (" '137 patent"), titled "Method and Apparatus for Coin Selection Utilizing Inductive Sensors," which describes a method of examining the material properties of coins by subjecting them to electromagnetic fields. The inventor listed on that patent is Guy L. Fougere of Arthur D. Little.

Mars' U.S. Patent No. 3,918,565 (" '565 patent"), issued November 11, 1975, is a second product of that work. The inventors are Guy Fougere, Walter Greene, and Dr. Dennis Jeffreys. The patent claims an invention of a method and apparatus for coin selection utilizing a programmable memory. A copy of the patent is at Plaintiff's Trial Exhibit 1 ("PX ——"). In essence, the inventors found an application for the semi-conductor memories being developed in the computer industry, as they described a method for assigning numeric values to a coin, storing the values in digital form, and using the stored values as limits to test the authenticity and denomination of a coin placed in the changer.

The inventors' concept was to produce a range of numeric values in digital form as representative of a signal of an authentic coin, to store that range of values in a programmable memory, and then compare the numeric values of a test coin's signal to the range of values of the authentic coin's signal.

The patent identifies several types of suitable programmable memory, all semiconductor devices, including the preferred Intel type 1701 or 1702 erasable programmable read only memory ("EPROM") and one-time or fusible link programmable read only memory ("PROM").

By incorporating a programmable memory in an electronic coin changer, the inventors had permitted the manufacturer to use specific coins to program the memory of the changer to read for that coin at the time the changer is built. As the EPROM semiconductor devices were reprogrammable, the manufacturer or someone else retained the option to reprogram the memory to read and accept different coins. Thus, for example, when initially manufacturing the changer, the manufacturer could use an American quarter to program or set the memory of an electronically erasable programmable read only memory ("EEPROM") semiconductor device to test for that coin. Thereafter, the manufacturer or someone else could reprogram the memory in the changer with a different coin, such as a token sold by a business such as Chuck E. Cheese restaurants, and the memory would then be used to test for the authenticity of that coin.

The inventors assigned their rights under the '565 patent to Mars. Mars' wholly owned subsidiary, Mars Electronics International, Inc. ("MEI"), practices the claimed invention in competition with Conlux.

## B. The Conlux E920

Conlux is a wholly-owned subsidiary of Nippon Conlux Kabushiki–Kasha, ("Nippon Conlux"), a Japanese corporation. Nippon Conlux began doing business in the U.S. in the early 1980's, prior to forming its U.S. subsidiary. Nippon Conlux designed and manufactures the accused device, the E920 coin changer, which Conlux markets under the name the "Premier."

Mars '565 patent includes sixty-three claims. At the trial in April and May of 1992, Mars alleged Conlux was infringing fifteen of those claims by using, selling, and importing the Conlux Premier Coin Changer, which incorporates Conlux's E920 coin discriminator.

Four of the fifteen claims asserted by Mars are independent claims; claims 1 and 60 are method claims, claims 20 and 61 are apparatus claims.

The independent method claims read as follows:

1. A method of examining coins with respect to authenticity including the steps of examining a first unidentified coin by making a measurement with respect to a first characteristic of the coin and thereby producing a first electrical signal having a quality with a first value indicative of the first characteristic of the first coin, comparing the first value with a stored value of the same quality in a programmable memory, and producing a signal indicative of the acceptability of the first coin with respect to the first characteristic when the first value is within predetermined limits for acceptable coins of a given denomination of the stored value.

60. A method of examining coins with respect to authenticity including the steps of examining a disc of known characteristics and causing a value to be stored in a programmable memory as a result of the examination, examining an unidentified coin at a later time and thereby producing a first electrical signal having a quality with a first value indicative of a first characteristic of the first coin, comparing the first value with the value stored in the programmable memory, and producing a signal indicative of the acceptability of the first coin with respect to the first characteristic when the first value is within predetermined limits for acceptable coins of a give denomination, the limits being dependent at least in part upon the stored value.

The independent apparatus claims read as follows:

20. Apparatus for examining coins with respect to authenticity comprising means for examining a coin by making a measurement with respect to a first characteristic and producing a first electrical signal having a quality representative of the first characteristic, a programmable memory, and means for comparing a first value of the quality of the first signal with one or

more values stored in the programmable memory.

61. Apparatus for examining coins with respect to authenticity comprising a coin passageway, means for producing an electromagnetic field in a region of the passageway, means for examining a characteristic of the interaction of a coin in the passageway with the electromagnetic field and producing an electrical signal having a quality representative of that characteristic, a programmable memory, and means for comparing values of said quality with upper and lower limit values stored in the programmable memory.

Conlux's E920 coin discriminator has electromagnetic coil sensors that can sense the characteristics of a coin, such as its diameter and thickness. These sensors have a standby voltage that is assigned a value and is stored in a register. When a coin is placed in the discriminator a new voltage signal is generated and stored in a register. The central processing unit ("CPU") then computes a ratio, dividing the voltage generated by the new coin by the standby voltage. This ratio is then stored in another register and compared with ratios stored in a random access memory to determine the coin's authenticity and denomination. The E920 is described in Figure 19 at DX 79.

### C. The Jury's Finding That Conlux Has Literally Infringed the Claims in the Patent

During the liability phase of the trial, Mars offered evidence to show Conlux's E920 infringed the independent claims of the '565 patent, claims 1, 20, 60 and 61, and eleven other claims dependent on those claims. The jury agreed and in its verdict form reported its finding that Mars had shown by a preponderance of the evidence that Conlux had literally infringed claims 1, 2, 3, 8, 11, 20, 21, 22, 23, 24, 27, 49, 57, 60, and 61. *See* Docket Item 173 ("D.I. ——").

### D. Conlux's Motion for Judgment as a Matter of Law

■ Pursuant to Federal Rule of Civil Procedure 50(b), Conlux has moved for judgment as a matter of law in its favor, contending that there is no substantial evidence it infringed the claims of the '565 patent. In moving to set aside the jury's verdict, Conlux must show either that the jury's findings of disputed material facts are not supported by substantial evidence, or that those findings cannot support the legal conclusions to be implied from the verdict. *Perkin–Elmer Corp. v. Computervision Corp,* 732 F.2d 888, 893 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984); *Read Corp. v. Portec, Inc.,* 970 F.2d 816 (Fed.Cir.1992).

■ In the context of a review of the jury's findings based on a dispute as to the proper interpretation of the claims of a patent, the interpretation of claims is defined as a matter of law based on underlying facts. *Tol–O–Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft m.b.H.,* 945 F.2d 1546, 1549 (Fed.Cir.1991). If the meaning of a term in a claim is disputed and extrinsic evidence is necessary to explain that term, then an underlying factual question arises, and construction of the claim is left to the jury in its determination of infringement. *Palumbo v. Don–Joy,* 762 F.2d 969, 974 (Fed.Cir.1985).

Conlux has focused the arguments in support of its motion on the two principal independent claims, claims 1 and 60, and argues that the findings of infringement of these method claims should be overturned for the following reasons.

#### 1. Claim 1 of the Patent

a. *". . . comparing the first value with a stored value of the same quality in a programmable memory . . . ."*

■ Conlux first argues that its E920 does not infringe claim 1 and the other independent claims in the patent as it does not compare signal values of a particular quality with stored values of the same quality.

In the method described in the patent, frequency values are converted into a numeric value corresponding to frequency counts, and a frequency count is then compared to frequency counts for representative coins that are stored in the read only memory ("ROM"). Conlux argues that in its device the voltage value in the sensors is not com-

pared to another voltage value. Rather, the value is converted to a ratio and the E920 compares that ratio to other ratios stored in its memory. Conlux contends that the E920 does not, therefore, directly compare a value having the same quality with values of the same quality stored in a programmable memory.

Mars has responded to this argument by noting that the meaning of the word "quality" as used in the patent was the subject of extensive testimony at the trial. For example, while Conlux called Dr. Vernon Rhyne to testify that the E920 does not compare signal values of a particular quality with stored values of the same quality, Mars called Donald R. Kesner, an electrical engineer, to testify that it did. Mr. Kesner testified that, to one skilled in the art in the vending and coin mechanism industry, the term quality should be defined as "meaning that there is something about this particular signal that is representative of the interaction" and that the word as used in the patent should be read as encompassing a function, such as a difference, or Conlux's use of a ratio. *See* the transcript of his trial testimony at 1652 ("Kesner Tr. ——"). *See also* the transcript of Dr. Jeffrey's trial testimony at 130 ("Jeffreys Tr. ——").

The Court finds this issue was fairly presented to the jury and that there is substantial evidence in the trial record to support the conclusion that the term "quality" encompassed a function such as Conlux's use of a ratio and, therefore, that the E920 discriminator produces a "first signal having a quality with a first value indicative of the first characteristic of the first coin." There is, therefore, substantial evidence to support this aspect of the jury's finding that Conlux's device infringed claim 1 of the patent. Further, the Court finds Mars has offered the correct interpretation of the word quality as used in the claim.

b. *"... with a stored value of the same quality in a programmable memory...."*

■ Mars' invention provides for using a programmable memory in its coin selector. In the patent, the inventors identified several types of suitable programmable memory, including Intel erasable programmable read only memory ("EPROM") and other one-time or fusible link programmable read only memory ("PROM"). *See* PX 1 at col. 3, line 63–col. 4, line 35.

With an erasable programmable memory, the settings on a coin changer can be modified or reprogrammed so that the changer will accept new or different coins. At the trial, Guy Fougere, one of the inventors of the '565 patent, testified that one of the beauties of the invention is that it can be reprogrammed directly in the field, without having to be brought back to a central maintenance area.

The E920 does have an electronically erasable, programmable read only memory that stores coin reference data. It is not, however, erasable or reprogrammable in the field. On the contrary, Conlux has built a lockout feature into its unit which prevents the user from reprogramming the coin data in the EPROM. Conlux argues that, with the addition of this lockout feature, the E920 discriminator does not infringe claim 1 or any other claim in the '565 patent as it does not include a "programmable memory" within the meaning of the claims.

At the trial, Mars offered evidence to show that the EPROM in the E920 is erasable and reprogrammable and that Conlux has reprogrammed the E920 at its facilities in Missouri. It argued that while Conlux may have decided to prevent its customers from reprogramming the memory in the field, this does not mean that the E920 discriminator is not reprogrammable. It simply means that Conlux limits who it is that can accomplish that reprogramming.

Mars also argued that the term programmable as used in the patent is not limited to erasable programmable memory. While the inventors may have identified EPROMs as the preferred device, they also identified the following as suitable programmable memory: fusible link programmable read only memory; random access memory with a battery ("RAM"); and, read most memory ("RMM"). PX–1 at col. 3, line 63–col. 4, line 35.

The Court finds there is substantial evidence in the trial record to support the jury finding that the E920 infringes the claims in the patent even though it may not be programmable in the field. Further, the Court finds that the word programmable as used in the patent should not be read to mean that the programmability is limited to reprogrammability in the field. Rather, the term programmable in the patent includes both one-time and reprogrammable semi-conductor devices.

### c. "... comparing the first value with a stored value of the same quality in a programmable memory...."

■ Conlux also argues that the E920 does not infringe claim 1 as it does not directly compare the values from the sensors with stored values in the EPROM. In the E920, the values are compared in the RAM, and not in the EPROM.

Mars responded at the trial and in its post trial brief by arguing that Conlux is reading limitations into the claim that are not there. Mars contends the claim states that the value of the sensor should be compared, but need not be directly compared. *See* Kesner Tr. 741–44, and 1661–1662.

This issue was presented to the jury and there is substantial evidence in the record to support the jury's verdict that the E920 infringes claim 1 even though it does not directly compare the values from the sensors with values stored in the EPROM. Further, the Court finds that the claim should not be read as requiring that the comparison be direct.

### 2. Claim 60

■ Conlux contends that its E920 does not infringe claim 60 as it does not examine a disc of known characteristics, which Conlux would define as a replica. Conlux's E920 uses regular coins rather than a replica.

At the trial, Mars offered evidence that the term "disc" in the claim can be read to include both a coin and a token. *See* Dr. Rhyne Tr. 1541, and Kesner Tr. 1657–58. With this testimony, there is substantial evidence in the trial record to support the jury's

verdict that Conlux infringed Claim 60 in using a coin rather than a replica. Accordingly, the Court finds the term disc should not be read to be limited to a replica and that it can be read to include coins.

### 3. Conlux's Contention that the Claims in the Patent Were Obvious

■ During the trial, Conlux offered evidence to show that the '565 patent should be found invalid because the subject matter as a whole would have been obvious to a person having ordinary skill in the art at the time of the invention in October of 1972. That evidence included three principal prior art references that disclosed electronic coin discriminators and programmable memories prior to the date the invention was made.

One of the prior art references is U.S. Patent 3,870,137, titled "Method and Apparatus for Coin Selection Utilizing Inductive Sensors." *See* PX 24. Mr. Fougere is the inventor on that patent. It relates to a coin changer with a hard wired logic.

A second principal prior art reference is U.K. patent 1,196,034 (" '034 patent") by Siemens titled "Improvement in or Relating to Automatic Coin Recognition Arrangements." *See* DX 286. The '034 patent involves coincidence detection to validate coins. A mechanical finger scans the surface of a coin, producing an electrical variation corresponding to the contour of the surface of the coin.

A third reference is U.S. patent 3,373,856, (" '856 patent"), a March 19, 1968, patent by Kusters titled "Method and Apparatus for Coin Selection." *See* PX 88. The '856 patent involves coin discrimination based on signal loss due to presence of a coin in a magnetic field.

Conlux argued that the only significant difference between the claimed invention and these prior art references is the recitation in the patent of "programmable memory." It called Boley A. Andrews, a Vice President of Research at a competing company, Vendo, to testify that those persons of ordinary skill in the art of coin mechanisms were familiar with and had used erasable programmable memories prior to October, 1972.

Conlux argues the jury wrongfully ignored these established facts and has moved to set aside the jury's finding that Conlux had not shown by clear and convincing evidence that the claims of the patent were invalid as obvious. *See Newell Companies Inc. v. Kenney Manufacturing Co.*, 864 F.2d 757, 763 (Fed. Cir.1988), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989).

In opposition to the motion, Mars argues that there is substantial evidence in the record to support the jury's verdict. For example, Mars had called Donald Kesner to testify as an expert witness on the issue of the level of skill in the art at the time of the invention. In contrast to Mr. Andrews' testimony, Mr. Kesner testified that the level of skill was not very high in 1972, and that because the people in the field were not oriented towards the aspects of integrated circuits and microprocessors or controllers, the substitution of programmable memory for the hard wired logic in the '137 patent would not have been obvious. Kesner Tr. 647–49. Mars also notes that Dr. Rhyne, another Conlux expert, conceded on cross examination that one could not simply substitute a programmable memory for the hard wired logic in the '137 patent. Dr. Rhyne Tr. 1553–61. Finally, Mr. Kesner testified that the literature on programmable read only memory devices offered by Conlux did not suggest or teach the claimed application of PROM devices.

Conlux also argues that the prior art teaches the second step of claim 1, comparing the first value with a stored value of the same quality in a programmable memory. In response, Mars notes that it offered evidence at the trial to show this was not correct. No memory is present in the '137 patent and no numerical comparison is accomplished in the '856 patent. Further, the memory in the '034 patent does not store values. Dr. Rhyne Tr. 1559–65, and Kesner Tr. 731–36, and 740.

Finally, Mars argues that Conlux's claim that the invention was obvious is rebutted by the evidence of the commercial success of its coin changer Mars established through the testimony of Kathy Walters, MEI's Director of Finance, and others. *See, e.g.,* PX 196.

This evidence cited by Mars confirms that there is substantial evidence in the record to support the jury's finding that Conlux had not shown by clear and convincing evidence that the claimed subject matter as a whole would have been obvious to a person having ordinary skill in the art. The Court will, therefore, deny Conlux's motion for judgment as a matter of law on this issue.

### 4. Conlux's Contention that the Patent Violates the Best Mode Requirement

■ In its motion for judgment as a matter of law, Conlux argues that the evidence at the trial demonstrates clearly and convincingly that the '565 patent is invalid for failure to disclose the best mode, as the inventors concealed critical information regarding the sensing stations in the '565 patent and concealed their optimal solution for correcting those problems.

On these issues, Mars called Dr. Jeffreys and Mr. Fougere to testify. Both testified that to the extent they had identified problems with the sensors (such as potential problems with forgery by placing tape or plastic on a coin) they never identified a solution to the problems and thus lacked the intent to conceal a mode of practicing the claimed invention which was known to them and that they believed was "best." *See, e.g.,* Dr. Jeffreys Tr. 154–59. Further, with regard to the information concerning the characteristics, sensor location and frequency, both also testified that this information was disclosed in the '137 patent, which was referenced five times in the '565 patent. *See, e.g.,* Dr. Jeffreys Tr. 125 and Fougere Tr. 277. As the '137 patent was issued on March 11, 1975, the disclosure in that patent would have been available at the time of the issuance of the '565 patent on November 11, 1975.

There is substantial evidence in the record to support the jury's finding that Conlux had failed to show by clear and convincing evidence that the claims of the '565 patent are invalid on the ground of lack of disclosure of the best mode contemplated by the inventors for carrying out their invention.

E. Conlux' Motion for a New Trial based on Mars' Alleged Withholding of Evidence

 Prior to the liability phase of the trial, Mars filed an application with the Patent Office to correct the listing of the inventors on the '137 patent from Fougere to Fougere, Greene, and Dr. Jeffreys. *See* Fougere Tr. at 225. In connection with that application, Mars intended to argue in this case that the '137 patent could not be cited as prior art against the '856 patent. *See* D.I. 152, Exhibit D. As the Patent Office had not acted on that application prior to the trial, Mars went forward at the trial treating the '137 patent as prior art.

The liability issues were tried in late April and early May, 1992, with closing arguments and instruction to the jury on Wednesday, May 6, 1992. The jury returned with its verdict in favor of Mars on Friday, May 8, 1992. Thereafter, Conlux learned that the Patent Office had notified Mars on May 4, 1992, that it was denying the application to amend the identification of the inventors on the '137 patent. *See* D.I. 195, Appendix 11 at A105 (copy of Patent Office's decision).

Conlux has moved for a new trial based on Mars' failure to disclose this information as it received it, contending that the Patent Office's decision raises substantial questions about Mars' witnesses' credibility and that the decision raises serious doubts about the jury's non-obviousness conclusion. Mars has responded by arguing that the Patent Office's decision is only preliminary. Further, it notes that the subject matter of the decision was not relevant to the issues presented at trial, as it proceeded at the trial as if the '137 patent were prior art.

Conlux has not shown that the Patent Office decision or the information in that decision would have been admissible at trial, or that it would have been appropriate to cross-examine witnesses at the trial based on the

statements in the decision. The Court will, therefore, deny the motion for a new trial.

## II. DAMAGES PHASE

A. *The Court's Pre–Trial Rulings on Marking and Non–Infringing Alternatives*

The damages issues were tried to the jury in December of 1992.

 In November, 1992, the Court granted Conlux's motion for a partial summary judgment, finding that, because Mars had not marked its product with the number of the patent-in-suit, Mars could not recover damages for the period prior to August 10, 1992, the date it gave Conlux actual notice of the claimed infringement. *See* D.I. 283.

One element of the damages Mars sought to recover from Conlux was the estimated profits Mars lost as a result of Conlux's sales of the infringing product for the period from August 10, 1992, to November 11, 1992, the date the patent expired. In pre-trial discovery, Mars disclosed that it intended to argue it was entitled to calculate these lost profits based on all of Conlux's sales, rather than Mars' estimated market share of those sales. To establish the right to that measure of damages, Mars noted that it intended to prove in the damage phase of this case that the alternative product in the market, which is manufactured by Coinco, infringes a number of other patents held by Mars.

Conlux introduced its electronic coin changer in the U.S. market in late 1988 and sold its first unit in 1989. Since then, Mars, Coinco, and Conlux have sold the following electronic coin changer units and had the following relative market share in the United States for the period from January 1, 1989, through October, 1992:

| | 1989 units | mkt sh. | 1990 units | mkt sh. | 1991 units | mkt sh. | 1992 units | mkt sh. |
|---|---|---|---|---|---|---|---|---|
| Mars | 162,678 | 51.6% | 145,537 | 58.3% | 157,886 | 64.9% | 111,027 | 54 % |
| Coinco | 149,852 | 47.5% | 91,101 | 36.5% | 84,779 | 34.8% | 93,028 | 45.2% |
| Conlux | 2,618 | .8% | 13,143 | 4.9% | 746 | .3% | 1,881 | .9% |
| Total | 315,148 | | 249,781 | | 243,411 | | 205,936 | |

*See* D.I. 370, at 4, and DX 1006. Thus, during the period from 1989 through the fall of 1992, Mars and Coinco dominated the market. Conlux never achieved 5% of the total market share of electronic coin changer sales. With electronic coin changers selling in a range from $150 to $200 a unit, the total dollar value for sales of electronic coin changers was in the range of $50,000,000, with Conlux's annual sales never exceeding $2,500,000.

Mars filed this action against Conlux in December of 1990. That same year Mars sued Coinco in the United States District Court in New Jersey, alleging that Coinco's electronic coin changers infringed five other patents held by Mars. *See Mars, Incorporated v. Coin Acceptors, Inc.; Mars Electronics International Inc. v. Coin Acceptors, Inc.; v. Mars Electronics International, Inc. and M & M/Mars Incorporated,* Civil Action No. 90–49 (JCL). For further information on the claims involved in those cases see exhibit 1 to DI 252. The cases against Coinco apparently are still pending.

Prior to the trial on the damages issues, Conlux argued it would be burdensome and distracting to allow Mars to attempt to prove that the Coinco changers were not available as non-infringing alternatives to the Conlux E920, and moved to bar it from seeking damages based on that theory. Conlux noted that, as an alternative measure of damages, Mars could attempt to recover damages based on a combination of lost profits calculated based on Mars' relative market share and a reasonable royalty for the balance of the sales otherwise attributable to Coinco's market share.

The Court agreed with Conlux and granted its motion.

### B. Trial on the Damages Issues

The parties tried the damages issues to the jury over the course of eight trial days, with testimony beginning on Wednesday, December 9, 1992, and closing arguments on Thursday, December 17, 1992.

During the trial, Mars offered proof to show Conlux's infringement caused the following damages:

(1) *price erosion damages*—Mars argued it was entitled to $12,150,381 in damages suffered as a result of having to lower its prices to meet Conlux's competition.

(2) *lost profits*—Mars also argued it was entitled to $825,219 in damages for lost profits, including $545,562 as a combination of the lost profits Mars would have earned on its market share of the units sold by Conlux, and a royalty for the balance of the market share attributable to Coinco's sales, plus $279,657 in lost profits from price erosion on those units sold by Conlux.

(3) *head start damages*—Mars argued it was entitled to $16,140,308 in estimated damages it would suffer from November 11, 1992, to November 11, 1994, as a result of the head start Conlux will have in competing against Mars as a result of its infringement.

(4) *employee separation damages*—Finally, Mars sought $1,800,583 in damages incurred in having to lay employees off as a result of Conlux's competition.

*See* PX 529 (summarizing Mars' damages claims).

The total damages sought by Mars was $30,916,491. Adjusted for inflation, the amount was $37,776,065. *See* PX 530. With a trebling for Conlux's alleged willful infringement, Mars asked the jury to award it approximately $118,000,000.

### C. The Jury's Verdict

The parties submitted the damages issues to the jury with a set of special interrogatories. On December 18, 1992, the jury returned with a verdict rejecting all but one of Mars' claims for compensatory damages, finding Mars was entitled to $545,562 in damages for lost profits. On January 6, 1993, the Court entered a judgment in that amount in favor of Mars and against Conlux.

### D. Mars' Motion for Judgment as a Matter of Law and for a Partial New Trial

Mars has moved for judgment as a matter of law or a new trial contending that the

Court erred in its two pre-trial rulings in the damages phase of the case.

### 1. The August 10, 1990 Notice of Infringement

 Mars has moved for a new trial on its claim for damages for the period prior to August 10, 1990, the date Mars put Conlux on notice of its infringement claims. Mars seeks an additional $1,424,177 for pre-notice lost profits and $2,969,919 for pre-notice price erosion damages. The Court will deny Mars' motion, as it is in the nature of reargument and fails to identify any new matter that would require the Court to reconsider or change its pre-trial decision.

### 2. Exclusion of Evidence on Whether Coinco's Product Infringes the '565 Patent

Mars contends that the pre-trial decision precluding it from offering evidence to show Coinco's changers were not a non-infringing alternative, prevented it from obtaining an award of damages for price erosion, and from showing that Conlux and Coinco were both tortfeasors causing a single, non-apportionable harm and are, therefore, subject to joint and several liability.

It appears Mars may be confused on the relevance of information relating to Coinco and its coin changer. In the pre-trial decision, the Court found that although facts tending to show that Coinco's changer infringed Mars' patents may be relevant to establish Mars' claim for lost profits, the Court would not admit those facts into evidence as the probative value of the facts was outweighed by considerations of relative value of the evidence, the acceptability of alternative measures of damages, and undue delay, burden, and expense that would be required in allowing such facts into evidence. *See* Federal Rule of Evidence 404. In reporting that decision, the Court did not preclude either party from offering into evidence facts relating to Coinco and the sales of its changer that may be relevant to other issues of fact that are of consequence in the determination of the action. For example, information relating to Coinco's sales might be relevant to whether or not Coinco (as op-posed to Conlux) in fact caused the harm for which Mars seeks damages. If competition from Coinco, rather than Conlux, caused Mars to lose market share, then information relating to Coinco's sales is relevant to reduce or limit the price erosion and other market loss damages claimed by Mars without regard to whether or not Coinco's changer infringes Mars' patents. The Court noted this in granting Conlux's motion to preclude the proof on Coinco's alleged infringement.

With that decision, both parties offered evidence at the trial on the competition among Conlux, Mars, and Coinco. Mars argued that evidence showed the $37,000,000 in damages it claimed it has and will suffer can be attributed to Conlux. Conlux responded with its own substantial evidence, showing that Mars had not in fact suffered these damages and, even if it had, that its losses should not be attributed to Conlux. That evidence included Mars' own contemporaneous internal documents in which Mars' employees and agents pointed to Coinco as its major competitor and attributed Mars' problems in the market place to Coinco and not Conlux. *See, e.g.,* The Frank Lynn Report, MEI Growth Opportunities in the Vending Market, DX S–1071. A review of those documents shows that Mars repeatedly measured its performance in the market place against Coinco, with hardly a mention of Conlux. *See, e.g.,* DX S–1071, where the author writes: "... Coinco has since matched Mars' performance level and has exceeded Mars' service capabilities.... Mars needs to eliminate inconsistent service levels; Coinco is setting standard." *See also* S–1069, at 5, ("Coinco is gaining share at MEI's expense due to MEI product/service gaps and Coinco superior enhanced service strategy.")

The evidence adduced at the trial suggests that to the extent Mars has in fact suffered $35,000,000 to $40,000,000 in damages as a result of sales of infringing coin changers, Coinco rather than Conlux should be held liable for that harm. It appears the jury appreciated this when it rejected Mars request that it return a verdict of $37,000,000 in damages and instead awarded it $544,000, the sum sought by Mars for lost profits and royalties on Conlux's infringing sales.

■ In its motion for judgment as a matter of law or a new trial, Mars argues that the Court's decision to limit the proof as to Coinco's alleged infringement also prevented Mars from recovering damages from Conlux as a joint tortfeasor with Coinco. For two reasons the Court will deny this claim for relief. First, Mars is too late. Mars failed to identify this theory of liability before or during the trial. It was not in the Pre–Trial Order. Mars did not present evidence in support of the theory at trial. Mars did not ask the jury to award relief based on this theory and it did not ask the Court to identify this claim in the instructions to the jury.

■ Second, it does not appear from the case law cited by Mars in support of the motion that Mars could in any event recover these damages from Conlux based on the theory that Conlux and Coinco were liable as joint tortfeasors. For example, it is not clear Mars could have shown it has suffered a distinct or single harm caused by the two companies or that Conlux could not have shown that these damages could have been apportioned. *See U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 268 (3d Cir.1992). On the contrary, it appears that the jury in this case was able to identify the harm which was caused in fact by Conlux's infringing conduct.

The Court expects Mars has preserved these damage claims for its case against Coinco, and will deny Mars' motions to set aside the verdict and for a new trial based on the decision not to allow Mars to prove Coinco's infringement in the damage phase of this case.

3. The Jury's Decision that Conlux did not Willfully Infringe the '565 patent.

Mars contends the Court erred in giving the following instruction to the jury on the issue of willfulness:

Having found that Mars has proved that Conlux infringed the patent in suit, you should consider whether or not Mars has also proved that Conlux's infringement has been willful and deliberate.

An act is willfully and deliberately done if it is done voluntarily and intentionally. Whether a party's infringement is willful depends on an evaluation of the totality of the circumstances.

Infringement of a patent is willful and deliberate when the infringer knows of the patent and has no reasonable basis to believe he has a good defense that the patent is invalid, not infringed or unenforceable, but nevertheless proceeds to make the patented product or device or to use the patented process.

The plaintiff must prove willful infringement by clear and convincing evidence.

DI 361, at 1861–62.

Mars contends the Court should have given the jury the following instruction it has drawn from *Underwater Devices Inc. v. Morrison–Knudsen, Co. Inc.*, 717 F.2d 1380 (Fed. Cir.1983):

When a person is aware of someone else's patent that is relevant to a product he is or is contemplating making, using or selling, or a method or process he is practicing, that person has an affirmative duty of care to respect the rights protected by that patent. Thus duty normally requires that person to obtain competent legal advice from an attorney before engaging or continuing in any potentially infringing activity. The failure of a person in these circumstances to obtain timely, competent, legal advice is an important factor which supports a finding of willfulness.

A finding of willfulness does not require a finding of bad faith on the part of Conlux. In determining whether Conlux's conduct was willful, you should determine its state of mind based on all of the direct evidence, if such evidence is available, or based on circumstantial evidence and inference, if direct evidence is not available.

D.I. 311, at 43–44 (Plaintiff's Proposed Jury Instructions).

In its motion for judgment as a matter of law or for a new trial, Mars argues that the Court erred in failing to give this instruction, as it would have made clear to the jury that once Conlux was on notice of Mars' claim of infringement, it had an affirmative duty of care to respect Mars' rights and that the duty normally required it to obtain compe-

tent legal advice before engaging or continuing in any potential infringing activity.

The Court will deny Mars' motion for relief on this issue for the following reasons. First, the instruction as given by the Court fairly set out for the jury the legal standard it should look to in determining whether or not the defendant's conduct was willful and deliberate. That is, it instructed the jury to look to Conlux's intent in the context of the totality of the circumstances, including the information available to it and whether or not it had a reasonable basis to believe it had a defense to a claim of infringement. *See, e.g., State Industries, Inc. v. Mor–Flo Industries, Inc.,* 883 F.2d 1573 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990) ("To establish willful infringement, a plaintiff must prove by clear and convincing evidence that the defendant acted with no reasonable basis for believing it had the right to do so.... There are no 'hard and fast *per se* rules,' and the finding is based on the totality of the circumstances....").

In this case, the instruction proposed by Mars would have told the jury that once Conlux was aware of Mars' patent, it had an affirmative duty of care to respect Mars' rights and that this duty required it to obtain competent legal advice from an attorney before engaging or continuing in any potentially infringing activity. There is some case law that suggests this instruction may not be correct. *See, e.g., Avia Group Intern, Inc. v. L.A. Gear California,* 853 F.2d 1557 (Fed. Cir.1988) (defendant's failure to obtain legal advice is not determinative, rather it is one factor supporting a finding of willfulness.)

In addition, the instruction given by the Court avoided two problems presented by the instruction offered by Mars. It avoided the suggestion that a decision of willfulness should turn on any one fact or factor (a requirement that a party obtain legal advice) rather than the totality of circumstances. It avoided the use of the term "duty" and the risk of suggesting to the jury that there was a shifting of the burden of proof.

In this context, it may be better to provide the jury with a relatively simple and straightforward instruction that fairly describes the principles at work and the issue to be resolved, rather than attempt to modify and tailor the instruction to include a summary statement of rules culled from opinions where courts have applied these principles to particular facts and circumstances.

The second reason to deny the motion is that the evidence at the trial shows that Conlux did in fact exercise the due care required in the circumstances and did obtain advice from counsel. For example, Conlux called William Androlia, its attorney, to testify at the trial. Androlia is a patent attorney and a partner in the firm of Koda and Androlia. Androlia Tr. 1233. He testified he has a bachelor and master's of science degree in electrical engineering and took and passed the California bar exam in 1973 and the United States Patent Office exam in 1974. Androlia Tr. 1234. He currently teaches patent law at Pepperdine Law School and he works on patent applications and opinions in his practice. Androlia Tr. 1235.

Androlia testified he received Mars' initial notice alleging Conlux's E920 infringed Mars' '137 patent and forwarded it to Conlux. He testified that the people at Conlux were very concerned about the matter and wanted his firm to analyze the issues and advise them as to whether or not they were infringing Mars' patent. Androlia Tr. 1241. He also testified to the extensive efforts he undertook in responding to that request, including review of information relating to the E920 and the patent and file history, and investigation as to whether there was literal infringement or infringement under the doctrine of equivalents. Androlia Tr. 1243–46. His advice to Conlux was that it was not infringing the '137 patent and he confirmed that advice in writing to Mars' counsel in July of 1990. Androlia Tr. 1246.

Mr. Androlia testified that he then received Mars' August 10, 1990 letter. He forwarded it to Conlux and again they were very concerned. Androlia Tr. 1248. In response to Conlux's request he undertook a second review, this time of the '565 patent. His partner travelled to Japan for at least two meetings with the people at Nippon Conlux and received and reviewed additional in-

formation on the E920. Androlia wrote to Mars in October and December to report he was continuing his review of the matter. Androlia Tr. 1252. During a December 21, 1990 meeting he advised Conlux it was his opinion that the E920 did not literally infringe the patent, that there might be a problem under the doctrine of equivalents, but that the patent would probably be held invalid for obviousness. Androlia Tr. 1258.

■ At the trial, Mars tested the sufficiency of Mr. Androlia's representation and advice and argued to the jury that it should reject his work and find Conlux liable for willful infringement. The jury heard that evidence, weighed it, and decided Mars had not proven by clear and convincing evidence that Conlux had willfully infringed Mars' patent. There is substantial evidence in the record to support that verdict, to support the conclusion that Mars had failed to prove Conlux did not have a reasonable basis for believing it was not infringing Mars' patent, to support the conclusion Conlux had not willfully and deliberately infringed the patent, and to support the conclusion that Conlux acted to meet the duty of care identified by Mars, including having sought out and obtained competent legal advice from an attorney before engaging or continuing in the potentially infringing activity.

For these reasons, the Court will deny Mars' motion for judgment as a matter of law or a new trial on the issue of willfulness.

### E. Mars' Motion To Amend the Judgment

Mars has moved to amend the judgment to add prejudgment interest and to seek an award of a reasonable royalty.

#### 1. Mars' Motion to Amend the Judgment and Award Prejudgment Interest.

Pursuant to 35 U.S.C. 284, Mars has moved the Court to award prejudgment interest on the amount of damages awarded by the jury. Mars has submitted a proposed calculation based on a summary of Conlux's coin changer sales for the period from August 11, 1990 to November 11, 1992. Mars seeks interest at the short term prime rate charged by banks as reported by the Philadelphia Reserve Bank. Mars has calculated that interest on a monthly basis, with interest to be paid on the total of the principal balance and interest due each month. The total pre-judgment interest it seeks under this approach is $77,215.61.

Conlux does not oppose an order amending the judgment awarding prejudgment interest. It does, however, oppose Mars' calculation of the amount.

■ First, Conlux argues that Mars was responsible for delays in the resolution of the case and should not, therefore, be awarded any prejudgment interest for the period from resolution of the liability phase to the resolution of the damages phase. There is not a sufficient factual basis to attribute any delay in the litigation to one party or the other, or to suggest that the delay should lead to a forfeiture of a portion of the measure of damages intended to make Mars whole. The Court will not, therefore, reduce Mars' claim for prejudgment interest based on this argument.

■ Second, Conlux argues that the interest rate proposed by Mars is too high. Specifically, Conlux argues that the rate Mars proposes, the short term prime rate, is a rate tied to the cost of borrowing money, and that Mars is not entitled to this rate absent proof it had to borrow or was borrowing money during the period in question. Conlux proposes the Court use a rate that reflects the return Mars would have received on the money if it had invested it, such as the Treasury Bill rates.

While the short term prime rates ranged from 10 to 6% during the period from August of 1990, to December of 1992, the monthly Treasury Bill rates ranged from 7.26% to 3.55%. Compare the information from The Federal Reserve Bulletin at Exhibit A of Declaration of Ann Powers, D.I. 346, with the information from the Federal Reserve Bulletins at B–190 to 208, D.I. 373. Using the Treasury Bill rates, Conlux suggests that the judgment should be increased by $47,204.92, rather than the $77,215.61 sought by Mars.

If the Court's purpose here is to award interest to make Mars whole for the loss of the use of this money during the period from the date of the harm to the date of the judgment, the prime rate suggested by Mars serves that purpose better than the Treasury

Bill rate suggested by Conlux. In this case the cost of borrowing money—and not the rate of return on investing money—provides a better measure of the harm Mars suffered as a result of the loss of the use of money over time. *See Studiengesellschaft Kohle, M.B.H. v. Dart Industries,* 862 F.2d 1564 (Fed.Cir.1988).

### 2. Mars' Motion to Amend the Judgment and Award a Reasonable Royalty

■ One of the damage theories rejected by the jury was Mars' claim for a reasonable royalty on Conlux's inventory of unsold units, which Mars estimates were approximately 11,149 units as of September of 1992. Mars contends the jury erred in not awarding it that amount, and seeks an additional $1,680,-513.52 in damages.

Conlux argues that the Court should deny this motion as the issue was not fairly presented to the jury. That is, the request for this relief was not identified in the instructions to the jury and not provided for in the verdict form. Further, Conlux cites *Fausett v. Pansy Ellen Inc.,* 19 U.S.P.Q.2d (BNA) 1228 (N.D.Ga.1990) for the proposition that the inventory of units which were manufactured in Japan and stored in the United States are not "infringing" products and not the proper subject of an award of damages.

The Court will deny Mars' motion as Mars failed to present this issue to the jury or to preserve it for post-trial review by the Court.

### F. *Conlux's Motion to Stay Entry of Judgment or, Alternatively, to Stay Execution of Judgment*

Conlux has moved to stay entry of the judgment or execution on the judgment pending the results of a Patent Office reexamination of the '565 patent.

■ The motion to stay entry of the judgment is untimely, as it was filed on January 21, 1993, after the Court had entered judgment based on the jury's verdicts.

With regard to the motion to stay pending reexamination, Mars has submitted to the Court a copy of a March 24, 1993, Office Action in Reexamination by which the Examiner confirmed claims 1–19, 22–47, 49–52 and 54–63. The Examiner rejected claims 20, 21, 48 and 53, finding that they were clearly

anticipated by U.K. Patent No. 1,196,034 ('034 patent). (In rejecting those claims, the Examiner found that the '034 U.K. patent is directed to a device for checking the authenticity of coins and that the test signals produced by the device are stored in a "programmable memory" in the form of a magnetic tape. The Examiner rejected Mars' argument that the words "a programmable memory" in the claims should be read as limited to semiconductor devices.)

Mars reports that this decision renders Conlux's motion to stay moot, as the Examiner did not reject all claims infringed by Conlux and any one of the remaining valid infringed claims would justify the damages judgment. Conlux has not responded to this argument, nor has it argued that this decision is a basis for setting aside the jury's findings that Conlux had not shown by clear and convincing evidence that claims 20 and 21 were invalid on the ground that they would have been obvious. The Court will, therefore, deny Conlux's motion to stay the enforcement of the judgment, subject however to a further application for relief should Conlux take an appeal.